UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------
JOHN BUNN,

*Plaintiff*,

    - against -

CITY OF NEW YORK, LOUIS SCARCELLA,
STEPHEN CHMIL, and THE ESTATE OF JOHN BARBA,


*Defendants*.
-----------------------------------------------------------------------

**COMPLAINT AND
JURY DEMAND**

**Dkt. No.** ___19-cv-4667___

Plaintiff JOHN BUNN, by his attorneys Glenn A. Garber, PC, and Rickner PLLC, hereby alleges as follows:

**NATURE OF ACTION**

1.　　　This is an action to recover money damages for the violation of JOHN BUNN'S ("BUNN'S or "Plaintiff") rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as supplemental claims under the laws of the State of New York.

2.　　　Despite his innocence, BUNN was wrongfully convicted and served nearly 17 years in prison, and almost 11 years on lifetime parole, for the August 13, 1991 Brooklyn murder of New York City Correction Officer Rolando Neischer and assault of Robert Crosson (referred to at times as "the murder").

3.　　　BUNN was only 14 years of age, still in middle school, when he was wrongfully convicted of this awful crime. Due to the high-profile nature of the case and that the victims were correction officers, BUNN was targeted by prison guards, and physically and emotionally abused.

4.　　　The wrongful prosecution and conviction and ensuing damages were caused by the

intentional and malicious misconduct of notorious and disgraced Brooklyn homicide Detective LOUIS SCARCELLA, his partner Detective STEPHEN CHMIL, and Detective JOHN BARBA (deceased).  The claims against these Defendants include malicious prosecution, denials of due process, failure to intervene, conspiracy and the failure to prevent conspiracy.

5.     The wrongful prosecution and conviction were also caused by the New York City Police Department ("NYPD"), the Kings County District Attorney's Office ("KCDAO"), and Defendant CITY OF NEW YORK.

6.     Defendant CITY OF NEW YORK, through its agencies the NYPD and the KCDAO, enabled and fostered unethical cultures of closing cases, advancing false prosecutions, and obtaining convictions at all costs at the expense of fair and honest investigations and prosecutions in the NYPD and the KCDAO; which included the failure to train, supervise and/or discipline police and prosecutors in the NYPD and the KCDAO about their obligations to conduct honest investigations and to disclosure exculpatory and impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny (at times referred to as "*Brady"* and "*Brady/Giglio"*). In fact, both the NYPD and the KCDAO entirely failed to meaningfully discipline detectives and prosecutors for repeated violations of the rights of criminal defendants.

7.     Liability against the Defendant CITY OF NEW YORK is invoked under the doctrine of *respondeat superior* for the misconduct of Defendant Detectives SCARCELLA, CHMIL and BARBA and the CITY OF NEW YORK is liable under *Monell v. Department of Social Services of the City New York*,  436  U.S. 658 (1978), as its *de facto* policies and procedures were the driving force behind the constitutional violations that caused BUNN'S wrongful imprisonment.

## JURISDICTION AND VENUE

8.     This Court has original subject matter jurisdiction over BUNN'S federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because BUNN'S claims arise under laws of the United States, namely 42 U.S.C. §§ 1983, 1985, 1986 and 1988, and seek redress of the deprivation, under color of state law, of rights guaranteed by the United States Constitution, namely the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

9.     This Court has supplemental jurisdiction over BUNN'S state law claims pursuant to 28 U.S.C. § 1367(a) as they are part of the same case or controversy giving rise to the federal claims and share the same nucleus of operative facts as the federal claims.

10.     Venue is lodged in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1391(a)-(c) and 1402(b) because substantial parts of the events or omissions giving rise to the claim occurred in Brooklyn which is located in the Southern District of New York.

## CONDITION PRECEDENT TO SUPPLEMENTAL STATE CLAIMS

11.     BUNN complied with all conditions precedent to the commencement of the supplemental state claims.

12.     On or about June 11, 2018, BUNN timely served a notice of claim upon the Defendant CITY OF NEW YORK pursuant to Section 50-i of the New York General Municipal Law.

13.     More than 30 days has elapsed since BUNN served the notice of claim and the matter has not been resolved.

14.     BUNN submitted to a hearing pursuant to Section 50-h of the New York General Municipal Law on August 14, 2018.

15.     BUNN brings this action in a timely manner.

**JURY DEMAND**

16.     BUNN demands trial by jury in this action.

**PARTIES, EMPLOYEES, and POLICYMAKERS**

17.     BUNN was wrongfully prosecuted, indicted, tried, convicted, and imprisoned by the unlawful and illegal actions of the Defendants.

18.     Defendant CITY OF NEW YORK is and was at all times relevant herein a municipal corporation existing under and by virtue of the laws of the State of New York, and having the powers and duties imposed by law thereon, and has offices situated in the Eastern District of New York.

19.     The NYPD and the KCDOA are and were at all times relevant herein agencies of the Defendant CITY OF NEW YORK.

20.     At all times relevant to this action, defendant CITY OF NEW YORK, by its agents, servants, and employees was responsible for the operation, maintenance, and control of the NYPD and the KCDAO, and the selection, training, supervision, and disciplining of police officers and prosecutors.

21.     At all relevant times, the Police Commissioner was an officer in charge of the NYPD, an agency funded out of the CITY OF NEW YORK'S budget.

22.     The Police Commissioner and his authorized delegates at all relevant times had final authority, and constituted a policymaker for the CITY OF NEW YORK and whom the CITY is liable, with respect to the hiring, management, training, supervision and discipline of personnel employed by or assigned to the NYPD.

23.     The Kings County District Attorney, including Charles Hynes, was and is an elected

officer of Kings County in charge of the KCDAO, an agency funded out of the CITY OF NEW YORK'S budget.

24.     The Kings County District and her/his authorized delegates at all relevant times had final authority, and constituted a policymaker for the CITY OF NEW YORK and for whom the City is liable, with respect to the hiring, management, training, supervision and discipline of personnel employed by or assigned to the KCDAO.

25.     The Kings County District Attorney was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2.

26.     The State of New York has provided by statute that Defendant CITY OF NEW YORK'S constituent counties (including Kings County), and hence Defendant CITY itself, is liable for torts committed by County officers and employees, such as the District of Attorney of the Kings County, and Assistant District Attorneys "(ADAs")," and employees of the KCDAO. *See* N.Y. County Law §§ 53, 941.

27.     Defendant Detectives LOUIS SCARCELLA, STEPHEN CHMIL and JOHN BARBA were at all relevant times herein duly appointed agents, employees, officers, and servants of the NYPD.

28.     Defendants SCARCELLA, CHMIL, and BARBA are being sued in their individual capacities.

29.     At all relevant times herein, Defendant Detectives SCARCELLA, CHMIL, and BARBA acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State and CITY OF NEW YORK, and on behalf of and within the scope of their employment, duties and functions as agents, employees, officers, and servants of the NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions and

duties.

30.     Defendant Detectives SCARCELLA, CHMIL, and BARBA are entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTIONS

### Procedural History

31.     On November 24, 1992, Bunn was convicted by a jury of murder in the second degree and assault in the first degree.

32.     The judgment of conviction was rendered after a jury trial under indictment number 10150-1991 in the Supreme Court of the State of New York, Kings County, before Justice Gloria Goldstein.

33.     On December 14, 1992, Bunn was sentenced to 22 years to life in prison.  Because the sentence was illegal due to Bunn's juvenile offender status, it was reduced to 9 years to life on December 15, 1992.

34.     On December 19, 1994, the Appellate Division affirmed the conviction and upheld the sentence. *People v. Bunn,* 210 A.D. 2d 421 (2d Dept. 1994).  Leave to appeal in the Court of Appeals was denied on March 15, 1995. *People v. Bunn,* 85 N.Y.2d 906 (1995).

35.     While serving the lifetime parole portion of the sentence, Bunn moved to vacate his conviction on April 14, 2015, pursuant to C.P.L. § 440.10.

36.     The motion was granted on November 29, 2016, and Bunn's conviction was vacated based upon a decision and order issued by Justice ShawnDya Simpson.  The decision was appealed by the KCDAO.

37.     The KCDAO abandoned its appeal, and on May 15, 2018, conceded the motion to vacate the conviction and moved to dismiss the indictment against BUNN, which was granted by

the Court.

38.     The dismissal was merit based.  Even though  witnesses are still available, including Crosson (the only eyewitness), SCARCELLA and CHMIL (officers who worked on the case), the indictment was dismissed because the case was false from the inception, and its fallacious nature and the lack of credibility of the witnesses was exposed during the post-conviction reinvestigation and litigation and rendered it unworthy of re-prosecution and retrial.

### The Crime and Bunn's Alibi

39.     Robert Crosson and Rolando Neischer, both corrections officers, were sitting in Neischer's car at approximately 4:30 a.m. on August 13, 1991, at the Kingsborough Housing Projects in Brooklyn.  Two perpetrators approached Neischer's vehicle on bicycles (one on each side of the car), ordered the men out of the car, and shot both of them.  Crosson ran for help, and Neischer shot at the perpetrators as they got into his car and drove away, leaving their bicycles behind.  Neischer later died from his injuries.  Crosson was treated at the hospital for a gunshot wound to his hand.

40.     BUNN was home on August 13, 1991, when the crime occurred.  As the gunshots rang out at 4:30 in the morning, his mother Maureen Bunn awoke abruptly and checked on her children.  All three, including BUNN, were sound asleep in their beds.

41.     The next day, Mrs. Bunn learned from others in the neighborhood that two corrections officers had been shot and one had been killed.  She did not know either of them; however, she knew *of* Robert Crosson from the neighborhood as "Mel Kim," who sold drugs and stolen property.  The Bunn family's apartment was around the corner from the Kingsborough Projects where Crosson lived.

**The Dishonest Police Work**

42.      Disgraced Brooklyn Homicide Detective LOUIS SCARCELLA was assigned to work on the case with Detective JOHN BARBA of the 77th precinct squad.  Brooklyn Homicide Detective STEPHEN CHMIL was SCARCELLA'S partner, and also worked on the case.

43.      Crosson, who was sitting in the passenger seat when the perpetrators approached, gave varying descriptions of the perpetrators, none of which matched BUNN or his codefendant Rosean Hargrave.

44.      One of the descriptions of the perpetrator on the driver's side of the car was of a light-skinned black male in his twenties, 5'9" to 5'10" in height.  He later identified BUNN as this perpetrator.  Far from the description, BUNN was dark-skinned, only fourteen-years old, and approximately 5'2".  At the time, BUNN was in middle school and looked young for his age.

45.      One of Crosson's descriptions of the perpetrator on the passenger side of the vehicle was a light-skinned male black in his twenties.  He later identified Hargrave, and unlike the description of this perpetrator, Hargrave was a dark-skinned sixteen-year old.

46.      No photographic array was ever compiled for Crosson to view in relation to BUNN. No evidence placed BUNN at the scene, no statement indicated that he was involved, and his appearance did not match the assailants' descriptions.   Nevertheless, BUNN was inexplicably arrested the next day on August 14, 1991 and taken to the 77th Precinct.

47.      BUNN'S arrest was not only without probable cause, the circumstances surrounding it are disturbing.  The police had unreliable information that BUNN was Hargrave's friend, and because Hargrave was a suspect and (falsely) arrested, also without probable case, SCARCELLA, CHMIL and BARBA worked together to frame BUNN to fill the role of the second perpetrator.  And, they lied to prosecutors to cover this up in false police reports and in discussions

with prosecutors in the KCDAO.

48.    Hargrave (whose illegal arrest laid the improper foundation for including BUNN in the case) was falsely targeted as a perpetrator by CHMIL and SCARCELLA in an effort to close the case.  To justify Hargrave's arrest, they concocted a false story that Hargrave's photograph and a few pictures of other people were randomly selected from a drawer of hundreds and that Hargrave's photograph was picked out by Crosson.

49.    This false story was provided to prosecutors by SCARCELLA and CHMIL and they falsely testified to it at a pretrial suppression hearing to cause the admission of the Hargrave's identification at trial. Part of this false story was also contained in police report prepared by CHMIL and forwarded to prosecutors.

50.    In reality, SCARCELLA and CHMIL either lied about Crosson identifying Hargrave from a photograph (which was *after* Hargrave's arrest); or improperly influenced Crosson to falsely identify Hargrave and lied to prosecutors to cover this up.  Crosson knew Hargrave from the neighborhood, and Crosson who was on pain killers and/or inebriated and emotionally distraught from the incident, and was incapable of making a reliable identification at the time he purportedly made the photo pick of Hargrave.

51.    SCARCELLA, CHMIL and BARBA also lied about Hargrave's arrest claiming that they coincidentally encountered him in the hallway outside of his apartment in a multi-floor building, even though they did not know what floor he lived on or where his apartment was.  But in reality, Hargrave was illegally arrested in his home without a warrant and without consent to enter.  SCARCELLA not only testified to the false account of Hargrave's arrest at a suppression hearing, he also prepared a false police report about the arrest which was forwarded to prosecutors.

52.    Hargrave was then put in a lineup.  Although the police claimed that Crosson

"identified" Hargrave, a claim later adopted by Crosson, Crosson did not get a good enough view of the perpetrators to make a reliable identification and SCARCELLA knew it and nevertheless went ahead with the procedure.  SCARCELLA implied that Hargrave was the perpetrator on the passenger's side of the car and Crosson, eager to implicate the perpetrators and unable to make a reliable identification, followed SCARCELLA'S lead and misidentified Hargrave.

53.     The circumstances of the Hargrave lineup was falsely reported to prosecutors by SCARCELLA, CHMIL and BARBA, BARBA falsely testified about it at a pretrial hearing to enable the admission of the Hargrave identification, and BARBA prepared a false police report about the lineup which was forwarded to prosecutors.

54.     BUNN'S arrest also occurred in his apartment without a warrant.  On the morning of August 14, 1991, a group of police officers led by Detective BARBA knocked loudly on the Bunn family's apartment door. Mrs. Bunn opened the door and demanded to know what was going on.  Without consent to enter, the police burst into the apartment with guns drawn and rushed past Mrs. Bunn.  They then apprehended BUNN who was in his underwear eating breakfast.  When Mrs. Bunn asked why they were taking her son, the police told her it was for a robbery, and no mention was made of the murder.

55.     In reality, there was no probable cause to arrest BUNN for a robbery, they had no intention of pursuing such a case against BUNN, and Detectives BARBA, SCARCELLA and CHMIL used it as a pretext to bring BUNN to the 77th precinct, so they could continue to set him up for the murder.

56.     Once at the precinct, BUNN was put into a small locked room and handcuffed to a pole.  Detectives SCARCELLA and BARBA immediately began interrogating him and tried to intimidate him into falsely confessing to the murder and into implicating Hargrave.  At no time did

they, or any other police officers, say anything about a robbery.

57.     Mrs. Bunn's arrival to the 77th precinct was delayed because police officers were searching the apartment and holding her captive.  Once at the precinct, she demanded to see her son and during a brief encounter, BUNN cried and told her "Mommy, they are trying to say I killed somebody."  Mrs. Bunn became very upset, and was escorted out being told she could only see her son again at the criminal court arraignment.

58.     Detectives SCARCELLA and BARBA continued to interrogate BUNN and demanded that he make a statement implicating himself and Hargrave in the murder.  They informed him that they already had Hargrave in custody, that Hargrave had told them everything and implicated BUNN in the crime (which was false), that they knew BUNN had been present, and that if he didn't tell detectives what happened, he was "going away forever" and "never coming home."  Detective BARBA threatened to "bash" BUNN'S head into a wall, and Detective SCARCELLA, who was also present, did nothing to stop the threats.  BUNN cried and repeatedly insisted to detectives that he did not know anything and could not make any statement.

59.     Approximately four hours after BUNN arrived at the precinct, Detectives SCARCELLA and BARBA placed him in a lineup.  Both detectives were present in the room with Crosson as he viewed it.  From the circumstances of the murder, Crosson did not get a good enough view of the perpetrators and could never identify the real killer, who was situated on the far side of the car as Crosson was approached and a gun was placed in his face, and SCARCELLA and BARBA knew it.  In addition, Crosson was on pain killers and/or inebriated and emotionally distraught from the incident, and was incapable of making an identification at the time of the lineup, even if he did see the perpetrator on the driver's side (which he did not) and SCARCELLA and BARBA knew this as well.  Moreover, the description that Crosson had already given and did

not match either BUNN or Hargrave.

60.     Despite the fact that no reasonable police officer or detective would have proceeded with a lineup of BUNN under the circumstances, SCARCELLA and BARBA went ahead. Although they claimed that Crosson "identified" BUNN, a claim later adopted by Crosson, the identification occurred, and only could have occurred, because SCARCELLA implied that BUNN was the perpetrator on the driver's side of the car and Crosson, eager to implicate the perpetrators and unable to make a reliable identification, followed SCARCELLA'S lead and misidentified BUNN.

61.     The circumstances of BUNN'S lineup was falsely reported to prosecutors by SCARCELLA, and BARBA, BARBA falsely testified about it at a pretrial hearing to enable the admission of the identification at trial, and BARBA prepared a false police report about the lineup which was forwarded to prosecutors.

62.     Indeed, it was SCARCELLA'S pattern and practice at that time to engage in improper identification procedures, and other misconduct, to get civilian witnesses to falsely identify and implicate innocent suspects targeted by SCARCELLA.

63.     In a case against David Ranta that SCARCELLA worked on one year before BUNN'S, SCARCELLA fabricated evidence, which included engaging in an improper identification procedure to cause Ranta's wrongful conviction.  In the Ranta case, a popular Rabbi in Brooklyn had been murdered. Ranta was arrested, but none of the witnesses could pick him out. So SCARCELLA told a 13-year old boy, who had seen the murder, to pick the man with the big nose (which was Ranta).

64.     After Crosson "identified" BUNN, Detectives BARBA, SCARCELLA and CHMIL told the prosecutors, but failed to describe the true nature of their investigation or that

BUNN was misidentified due to their misconduct.

65.     Based on the false information, prosecutors declined to prosecute BUNN for the robbery.  This declination was made because prosecutors were unaware that the robbery was a pretext and they wrongly believed that a viable murder charge could be brought against BUNN.

66.     BUNN learned that he was "identified" when the lineup fillers were permitted to leave the room, and Detective SCARCELLA entered and told him: "Congratulations.  This is your lucky day."  BUNN was led into another room where he remained for a number of hours as the detectives came in and out, questioning him, until SCARCELLA returned and told him to "prepare for the cameras."  Exploiting their rogue police work for personal gain, SCARCELLA, CHMIL and BARBA escorted BUNN out of the police station for a "perp walk" in front of the media.

67.     Detectives SCARCELLA, CHMIL and BARBA lied to prosecutors about the true circumstances of Hargrave's and BUNN'S arrests and the lack of reason to connect BUNN to the murder.

68.     Had Detectives SCARCELLA, CHMIL and BARBA been honest with prosecutors, prosecutors would have known that the robbery case against BUNN was a pretext and that the murder case against him was a fallacy, that there was no probable cause to arrest BUNN for either, and they would not have prosecuted him.

69.     In addition, had the prosecutors known that BUNN was arrested in his home, without a warrant and without consent, the prosecution would have vitiated the murder prosecution because the arrest was in violation of *Payton v. New York*, 445 U.S. 573 (1980), and the lineup "identification" was the fruit of the illegal arrest. *Dunaway v. New York*, 442 U.S. 200 (1979).  It, therefore, could not have been used against BUNN, and without it the case could not have been prosecuted.

70.     SCARCELLA, CHMIL, and BARBA were well aware of the prohibition on placing either Hargrave or BUNN into a lineup following an illegal arrest, so they generated false police reports and made false claims that the arrests were legal.

71.     As to BUNN, because SCARCELLA, CHMIL, and BARBA did not have a purported photographic identification to justify placing him in a lineup, they used the unreliable robbery story. The prosecution was fooled, and relied on false police accounts and the lineups for the prosecution, including presenting testimony by all three detectives in a pretrial *Wade* hearing when Hargrave and BUNN attempted to have the identifications suppressed.

72.     Had SCARCELLA, CHMIL, and BARBA been truthful, the identifications by Crosson would never have been admitted into evidence and BUNN would never have been prosecuted, indicted or convicted.

### The Trial and Suppression of *Brady/Giglo* material by the KCDAO

73.     The trial lasted a little over one day.

74.     The only evidence offered by the prosecution was the testimony of Crosson, who related the events of the crime and made in-court identifications of both BUNN and Hargrave.

75.     Fingerprints and palm prints recovered from Neischer's car and on the bicycles left at the scene by the perpetrators did not match those of BUNN, Hargrave, or Neischer.

76.     Blood was recovered from the driver's seat of Neischer's car, the frame of the driver's side door, and from the bicycles.  According to Detective BARBA, all of the blood samples were submitted to the police laboratory for serology comparisons, but no results were obtained, so no connection was ever made between the blood evidence and BUNN or Hargrave.

77.     Moreover, although it was believed by police that the perpetrators were shot and hospital canvasses were done to find injured suspects, neither BUNN nor Hargrave had any bullet

wounds or other marks on their bodies when they were arrested the day after the crime.

78.     Thus, the trial testimony of Crosson, the only witness to the crime, was crucial to the case.

79.     However, ADAs from the KCDAO assigned to the case, including Edward Boyar who tried the case, withheld important *Brady/Giglio* material that would have been used to challenge Crosson's credibility at trial and his lineup and in-court identification of BUNN.

80.     There was an audio tape of an interview of Crosson by an ADA on August 14, 1991. This tape was withheld and not disclosed until the post-conviction litigation, more than 20 years after the conviction.  On the tape, Crosson appeared to be under influence of drugs, alcohol, or painkillers from medical treatment for the gunshot wound to his hand, or distraught.  This evidence cast serious doubt on the quality of his state of mind on August 14, 1991 when the police investigation and lineup occurred, and on his ability to effectively make identifications.

81.     In addition, on the tape, Crosson described the crime to be much quicker than how he described it at trial, and he described himself to be more frantic when the crime occurred, as opposed being calm and collected, as he claimed to be at trial, when he described how the crime occurred.

82.     It is without question that this withheld evidence was material. Highlighting the significance of Crosson's credibility to the case and the incredulity of the lineup "identification," the Court that vacated BUNN'S conviction stated in a written decision:

> Crosson's identification of Bunn was compromised by the location in which Bunn was said to have stood, on the other side of the car, by the sequence of events and the stress of the incident.  Crosson's testimony that he could clearly see the perpetrator on the other side is in contradiction to the stress of the experience, that Crosson was preoccupied by his assailant and blocked his view with his hands, and it happened quickly, all the while sitting in the vehicle in  the late morning hour, in the darkness of the night with only street lighting…. Further, Crosson did not provide any description or identifying characteristics of the assailants at the trial or

hearing…. No specific details about the assailants' description was provided to demonstrate that Crosson recognized the defendants from his memory of the incident.

*People v. Bunn,* Decision and Order Vacating Conviction (Sup. Ct. Kings Co., Nov. 22,

2016).

83.     BUNN was wrongfully convicted by a jury after the unfair prosecution and trial, which were undermined by due process violations.[1]

### CITY OF NEW YORK's (NYPD and KCDAO) Deliberate Indifference to Improper and Dishonest Investigations and to *Brady/Giglio* Violations, and the Failure to Train, Supervise, and/or Discipline

84.     At the time of BUNN'S arrest, the CITY OF NEW YORK acting through policymaking officials for both the NYPD and the KCDAO acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity; implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and/or discipline concerning the constitutional duty of officers to accurately report the nature of their investigations to prosecutors; and for police and prosecutors to properly document and disclose *Brady/Giglio* material.

85.     Supervisory personnel in both offices were aware of this widespread misconduct but took no adequate corrective or preventive measures to prevent it. NYPD officers, trial prosecutors in the KCDAO'S office, and the supervisors and policymakers in the respective offices were deliberately indifferent to the abuses inflicted on criminal defendants whose convictions were regularly secured without regard to their constitutional rights or their guilt. Thus, police officers

---

[1] In 2001, Mrs. Bunn enlisted the assistance of the former Second Look Program at Brooklyn Law School, to reinvestigate her son's case. Professors William Hellerstein and Daniel Medwed made efforts to track down the untested blood evidence which was found on the driver's side of the vehicle and on the bicycles used by the perpetrators. However, they learned that the KCDAO authorized its destruction in a release signed in 1993.  This was before Bunn's direct appeal and was inconsistent with  the practice for preserving evidence then and now.

and prosecutors were left to operate with the sense that they could engage in these abuses without risking appropriate disciplinary consequences.  Correspondingly, *de facto* policies existed in the NYPD and the KCDAO during the time of BUNN'S arrest, prosecution and trial that made it acceptable for and even encouraged police officers to lie about the true nature of their investigations and police and prosecutors to commit *Brady/Giglio* violations.

86.     BUNN'S wrongful conviction was not an isolated incident.  By 1991 when his case went to trial, the NYPD and the KCDAO were well aware that arrests tainted by improper police conduct and police investigations and prosecutions tainted by *Brady/Giglio* violations were a major problem.  Indeed, a steady parade of wrongful and troubled convictions caused by constitutional violations occurred in New York City and in Kings County during the time period that led up to and surrounded BUNN'S conviction.

87.     The investigation of the New York State Bar Association's Task Force on Wrongful Convictions released in 2009, covered 53 cases.  It found that "government practices" – referring to a range of errors and misconduct by police and prosecutors, including the failure of prosecutors to comply with *Brady* obligations and the "early prosecutorial focus, especially by the police, on a particular individual as the person who committed the crime coupled with a refusal to investigate to determine if there is a basis to believe, based on available information, that someone else may have committed the crime" – contributed to more than 50% of New York wrongful convictions studied by the Task Force. *Final Report of the New York State Bar Association's Task Force on Wrongful Convictions*, April 4, 2009, "NYSBA Report," at 19.[2]  In addition, the Task Force

_____

[2] The 53 cases spanned from 1964 to 2004 and 38 of them (over 70%) were from 1985 to 1996, the eleven-year period that straddles BUNN'S arrest.  NYSBA Report, Appendix B, at 186. Moreover, most of the cases were from New York City, and many were from the Brooklyn.

identified a much larger number of cases that "d[id] not reveal an actually innocent person being wrongfully convicted," but "nonetheless often reveal[ed]" a pattern of "troubling due process violations that may result in a defendant being denied a fair trial." *Id*.

88.     The Task Force found that one contributing factor to the pervasive and far-reaching problem of *Brady* evidence not being properly disclosed to the defense, as required by both the state and federal constitutions, was where police failed to make reports of "information that was viewed by the detective as not aiding the investigation." *Id.* at 44.  Yet the police, by deliberately suppressing and failing to document this sort of information, all but ensure that a fair trial will not occur, in violation of due process of law. The Task Force observed that "[p]rosecutors' access to evidence known to the police depends ultimately on the willingness of the police to record, preserve, and reveal such evidence." *Id.* at 37-38.

89.     One of the recommendations by the Task Force as to police was the need for "Train[ing] and Supervis[ion] in the Application of *Brady* and Truthful Evidence Rules." *Id.* at 37. As to Prosecutor's Offices, the Task Force noted that "despite the clarity and longevity of the *Brady* rule, a sampling of recent published or otherwise available decisions show such conduct still occurs." *Id.* at 26 (internal cites omitted). Consequently, to the extent not already in existence, it recommended that Prosecutor's Offices create procedures to evaluate and impose sanctions for prosecutorial misconduct. *Id.* at 29.  In the time period leading up to BUNN'S arrest and through his prosecution, trial, appeal and post-conviction litigation the KCDAO did not have such procedures in place.

90.     On July 7, 1994 – about a year and a half after BUNN'S arrest – a report by the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department (the "Mollen Report") noted that "[p]olice perjury and falsification of

official records is a serious problem facing the Department" that "taints arrests on the streets."
Mollen Report at 36. The Mollen Report referred to police falsifications as "probably the most
common form of police corruption facing the criminal justice system" and observed "a deep-rooted
perception among many officers of all ranks within the Department that nothing is really wrong
with compromising facts to fight crime in the real world.  Simply put, despite the devastating
consequences of police falsifications, there is a persistent belief among many officers that it is
necessary and justified, even if unlawful."  *Id.* at 41.

91.     A study of exonerations in the United States from 1989 to 2012 found that Kings
County was one of counties in the nation with the highest incidences of exoneration, following
wrongful convictions.  Samuel R. Gross, University of Michigan Law School, *Exonerations in the
United States, 1989-2012, National Registry of Exonerations,* June, 2012, at 36.

92.     It was inherently obvious to the NYPD and the KCDAO that on and around the
time of BUNN'S arrest, prosecution, and trial there was a need to train, supervise, and/or discipline
police to engage in proper and honest investigations and for police and prosecutors to comply with
their constitutional *Brady/Giglio* obligations to counteract the pressure that the NYPD and the
KCDAO applied to police and prosecutors to obtain convictions.

93.     The NYPD knew to a moral certainty that police were conducting improper
investigations and were targeting suspects based on unreliable and/or false information and were
influencing witnesses to misidentify suspects.  The NYPD and the KCDAO also knew to a moral
certainty that *Brady* issues regularly arise in the investigation and prosecution of criminal cases;
that such issues present their employees with difficult choices of the sort that instruction, training,
supervision, and/or discipline will make less difficult; that their employees facing such issues have
strong incentives to make the wrong choices, especially given the pressure in the NYPD to close

cases and in the KCDAO to win convictions at any cost; that the wrong choice by their employees concerning *Brady/Giglio* issues will frequently cause the deprivation of the constitutional rights of the accused and cause them constitutional injury; and that their employees had a history of making wrong choices in such matters, specifically related to *Brady/Giglio* obligations.

94.     In the years surrounding the wrongful prosecution and conviction of BUNN, officers of the NYPD routinely engaged in improper investigations and police officers and members of the KCDAO routinely failed to turn over exculpatory and impeachment evidence, including information that undermined the reliability of identifications, that someone else committed the crime, and that discredited witnesses.

95.     Public records demonstrate that in the time period surrounding BUNN'S arrest and conviction numerous criminal defendants were wrongfully convicted in Kings County by means of similar unconstitutional practices of police officers and prosecutors.

96.     The National Registry of Exonerations, a database that tracks and analyzes wrongful convictions in the United States, found that 36 of the wrongful convictions in Kings County involved "official misconduct"[3] and stemmed from investigations and/or convictions that occurred within the period of seven years before and seven years after BUNN'S arrest.  And, of those 36 cases, 14 (including Bunn and Hargrave) involved police investigations that Detective SCARCELLA worked on. www.law.umich.edu/special/exoneration/Pages/about.aspx (last visited August 12, 2019).

97.     Numerous court cases demonstrate a pattern of *Brady/Giglio* violations and related

---

[3] Official misconduct is defined as "[p]olice, prosecutor, or other government officials significantly abus[ing] their authority or the judicial process in a manner that contributed to [an] exoneree's conviction[,]" and it primarily involves the withholding of *Brady* material by police and prosecutors.

misconduct committed by the NYPD and the KCDAO that is similar to that which occurred in this case and demonstrates that such violations were known to be regular practices in both the NYPD and the KCDAO from the mid-1980s to the late-1990s.  Attached hereto and incorporated herein are: 1) Criminal case decisions regarding *Brady* and related violations by the NYPD (Exhibit, "Ex." A); 2) Civil rights cases regarding *Brady* and related violations by the NYPD (Ex. B); and Criminal case decisions regarding *Brady* and related violations by the KCDAO. (Ex. C).

98.    Independent of the failure to train and supervise, the failure to discipline police and prosecutors for their misconduct, including improper investigations and *Brady/Giglio* violations, were significant problems within for the NYPD and KCDAO in the period leading up to and through BUNN'S arrest and conviction and it demonstrates a deliberate indifference, indeed the approval of such such violations.

99.    Regarding the NYPD, the Mollen Commission noted that "the Department's top commanders must share the blame" for the pervasive tolerance of police perjury and falsification. Yet, the Commission reported, "[w]e are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch. Nor do we know of a single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification." Mollen Report, at 41. "Changing attitudes about police falsification depends largely on the Department." *Id.* at 42.

100.    The Mollen Commission further "found a police culture that often tolerates and protects corruption [and that] the Department completely abandoned its responsibility to transform that culture into one that drives out corruption ..." *Id.* at 107.

101.    The exposed behavior of Detective SCARCELLA, and the 14 wrongful convictions that he played a hand in, is so troubling and prolific that it alone establishes that NYPD had notice

of and still turned a blind-eye to his misconduct, and as a result enabled and caused the misconduct that occurred in BUNN'S case.

102.   In fact, around the time of the investigation in BUNN, Detective SCARCELLA openly displayed a cavalier attitude toward his work with NYPD.  The business card he handed out on the force described him and his partner as "adventures, marathoners, regular guys, and mountain climbers," which was untrue.  When interviewed on the Dr. Phil television show he bragged that he didn't "play by the rules" when he was a homicide detective with NYPD.

103.   In the 14 wrongful convictions that Detective SCARCELLA was involved in (12 not including BUNN and Hargrave), he improperly influenced witnesses to misidentify people, and manufactured confessions and other evidence to frame suspects, among other misconduct. Those cases, which involved investigations around the time of the investigation in BUNN'S case include:

a)   *People v. Darryl Austin*

b)   *People v. Carlos Davis*

c)   *People v. Vanessa Gathers*

d)   *People v. Derrick Hamilton*

e)   *People v. Robert Hill*

f)   *People v. Alvena Jennette*

g)   *People v. Roger Logan*

h)   *People v. Sunde Moses*

i)   *People v. David Ranta*

j)   *People v. Shabaka Shakur*

k)   *People v. Jabbar Washington*

l)   *People v. Shawn Williams*

104.   Given the egregious nature of the misconduct, the volume of cases in which it occurred and that much of it occurred in plain sight of other police officers and supervisors at NYPD, some of whom participated in it with SCARCELLA it is a virtual certainty that NYPD knew of deliberate and/or reckless misconduct and turned a blind-eye to it, or encouraged it through letting the rogue culture where it occurred continue, through the failure to train, supervise and/or discipline; and as result of NYPD's acts or omissions caused the wrongful prosecution and conviction in BUNN'S case.

105.   *People v. Jabbar Collins* is an exemplar case that shows deliberate indifference to, and acceptance of misconduct and *Brady/Giglio* violations in the KCDAO in 1994 and 1995 shortly after the prosecution and conviction in BUNN'S case. The misconduct involved withholding exculpatory material, including a witness recantation and witness intimidation. During the post-conviction litigation and civil rights action it was also revealed that District Attorney Charles Hynes, the same District Attorney in charge of the office when BUNN was prosecuted, protected instead of disciplined ADAs when their misconduct was exposed.

106.   Hynes first became the District Attorney on January 1, 1990. In the *Collins* case, Hynes and others admitted that the only disciplinary procedure in place for *Brady* violations, like the one here, was for Hynes to personally review the appellate decision to decide if any discipline was warranted.  And he, and others in his office at the time, could not recall a single incident in which a prosecutor was disciplined.

107.   This not only proves that Hynes, who tried to some extent to shield himself from misconduct in his office, was aware of the misconduct, which not only included *Brady* violations

but also improper summation and coercion of uncooperative witnesses in the "Hynes Hotel."[4] It also proves that he effectively encouraged misconduct of prosecutors, who surely learned that they would not be disciplined for violating the rights of criminal defendants, like BUNN.

108.    In fact, Hynes and the KCDAO had the offending prosecutor's back when they committed *Brady* violations, and would do all in its power to protect the offenders.

109.    In sum, the NYPD and the KCDAO were, at a minimum, deliberately indifferent to an obvious need for greater training and supervision as to improper police investigations *Brady* disclosures, and/or to discipline for *Brady* violations, and this indifference constituted a *de facto* policy against disclosure and was a substantial cause of the violation of BUNN'S federal constitutional rights.

## PLAINTIFF'S INJURIES AND DAMAGES

110.    As a direct and proximate consequence of the aforementioned actions by the Defendants, Plaintiff served almost 17 years of imprisonment, and more than decade on lifetime parole, with "Max" status meaning that the slightest violation would land him in back in jail for a minimum of one year.

111.    Due to the nature of the crime Plaintiff was labeled as a correction officer killer, and considered to be a "menace to society." As result of these false monikers he was ridiculed, deprived privileges, and beaten in prison.

112.    Because of his tender age – only 14 years old – when framed, Plaintiff lost his youth

---

[4] The "Hynes Hotel" refers to a controversial practice by the KCDAO of detaining witnesses as overnight "prisoners" in hotels where it was alleged that they were coerced into giving false testimony against criminal defendants on trial.  DA Hynes initially denied that such practice existed when running for re-election in 2013, then admitted to it when deposed on a subsequent civil rights case.  John Marzulli, *Ex-Brooklyn District Attorney Charles Hynes admits to detaining witnesses, a practice he denied last year*, Daily News, April 18, 2014.

and grew up in prison in the harshest and most abusive environments imaginable.

113.    Plaintiff suffered severe emotional and mental anguish and pain as a result of being punished for crimes he did not commit.  He was denied effective treatment for his emotional injuries while incarcerated, and continues to suffer mental anguish to this day.

114.    Plaintiff is afraid of police.

115.    Plaintiff was denied the opportunity to pursue normal relationships with, and to enjoy the companionship of, family and friends.

116.    Plaintiff is also struggling to gain the trust of family members and friends and to repair broken relationships.

117.    It is now difficult from him to have healthy relationships with women.

118.    Elders in Plaintiff's family died during his incarceration and he lost their love and companionship.

119.    Plaintiff was denied years of gainful employment and income.  His earning power and ability to support himself have been permanently hampered by the years of productive work experience his wrongful imprisonment denied him.

120.    Plaintiff has been publicly shamed, disgraced, and humiliated.  Nothing can undo the reputational damage he has sustained.

121.    Plaintiff was denied fundamental constitutional rights.

122.    Plaintiff has lost his faith in the American justice system.

## FIRST CAUSE OF ACTION

**Malicious Prosecution under 42 U.S.C. § 1983 and New York State Law
(Against SCARCELLA, CHMIL, BARBA and The CITY OF NEW YORK)**

123.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

124.     SCARCELLA, CHMIL, and BARBA caused the initiation and continuance of criminal proceedings against Plaintiff, including drafting false police reports that were forwarded to prosecutors and fabricating identifications of Plaintiff and Hargrave, which inevitably resulted in the wrongful prosecution of Plaintiff.

125.     There was no probable cause for the criminal proceeding against Plaintiff, and SCARCELLA, CHMIL, and BARBA knew as much.

126.     The prosecution was unaware of the false and fabricated evidence and unknowingly presented it to the grand jury and obtained an indictment with the false and fabricated evidence.

127.     SCARCELLA, CHMIL, and BARBA acted with actual malice.

128.     The prosecution terminated in Plaintiff's favor when his conviction was eventually vacated.

129.     SCARCELLA, CHMIL, and BARBA'S actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

130.     The CITY OF NEW YORK is liable under state law for SCARCELLA, CHMIL, and BARBA'S tortious actions under the doctrine of *respondeat superior.*

### SECOND CAUSE OF ACTION

### Denial of Due Process and Denial of a Fair Trial under 42 U.S.C. § 1983<br>(Against SCARCELLA, CHMIL, and BARBA)

131.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

132.     SCARCELLA, CHMIL, and BARBA illegally arrested Plaintiff (and relatedly Hargrave), and the identification was the unconstitutional fruit of the poisonous tree, and would have been suppressed in a *Wade* hearing, pursuant *United States v. Wade*, 388 U.S. 218 (1967), *Payton v. New York*, 445 U.S. 573 (1980), and *Dunaway v. New York*, 442 U.S. 200 (1979).

133.   SCARCELLA, CHMIL, and BARBA also fabricated a robbery as a cover for Plaintiff's wrongful arrest, and created false police reports to claim that the arrest, and thus the lineup of Plaintiff, was legal.

134.   This false information was forwarded to prosecutors, who relied on it, and used it to successfully oppose Plaintiff's attempt to have the lineup excluded through a *Wade* hearing.

135.   Criminal defendants, such as Plaintiff, had a well-established right to a fair *Wade* hearing, and SCARCELLA, CHMIL, and BARBA together undermined that right.

136.   This violation ultimately caused Plaintiff's wrongful conviction because without it, the lineup would have been excluded at trial and there would have been no evidence to convict him, given nothing but Crosson's identification existed that implicated him in the murder.

137.   SCARCELLA, CHMIL, and BARBA'S actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

### THIRD CAUSE OF ACTION

### Denial of Due Process and Denial of a Fair Trial under 42 U.S.C. § 1983
### (Against SCARCELLA)

138.   Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

139.   SCARCELLA had prior to Plaintiff's trial, fabricated evidence in at least seven other murder cases, which ultimately resulted in the wrongful convictions of Darryl Austin, Carlos Davis, Derrick Hamilton, Robert Hill, Alvena Jennette, David Ranta, and Shabaka Shakur.

140.   SCARCELLA failed to disclose this past history of fabrications, as both exculpatory evidence and impeachment evidence, under *Brady* and *Giglio*.

141.   Had SCARCELLA disclosed this past misconduct, as well as his misconduct in the Hargrave and Plaintiff lineups, Plaintiff would never have been convicted.   Not only is this

evidence material, it would have devastated the prosecution's case.

142.   Plaintiff's conviction was reversed in part because SCARCELLA'S history of misconduct was so pervasive and discrediting that Justice Simpson found it was newly discovered evidence under New York C.P.L. § 440.10(1)(g).

143.   This violation caused Plaintiff's wrongful conviction because, had SCARCELLA followed his *Brady* and *Giglio* disclosure obligations, Plaintiff would never have been prosecuted or tried, and if tried he would have never have been convicted by a jury.

144.   SCARCELLA'S actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

## FOURTH CAUSE OF ACTION

### Denial of Due Process and Denial of a Fair Trial under 42 U.S.C. § 1983
### (Against SCARCELLA and BARBA)

145.   Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

146.   SCARCELLA, and BARBA fabricated the identification of Plaintiff by Crosson, by improperly assisting him in making an identification that he otherwise could not have made, and was in fact false, in violation of Plaintiff's right to due process of law and to a fair trial under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

147.   This fabricated identification was forwarded to the prosecution, who was not otherwise aware of the fabrication.

148.   This fabrication was material and a jury would (and did) rely on it in wrongfully convicting Plaintiff.

149.   The prosecution then used this fabrication to prosecute Plaintiff.

150.   As a direct and proximate result of the deprivation of his constitutional rights,

Plaintiff suffered the injuries and damages set forth above.

151.    SCARCELLA, and BARBA are therefore liable for Plaintiff's injuries under 42 U.S.C. § 1983.

152.    SCARCELLA, and BARBA'S actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

### FIFTH CAUSE OF ACTION

### Failure to Intervene Against All Defendants
### (Against SCARCELLA, CHMIL, and BARBA)

153.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

154.    SCARCELLA, CHMIL, and BARBA failed to intervene to prevent, end or report the unlawful and unconstitutional conduct to which Plaintiff was subjected to despite the fact that they had opportunities to do so. Any of these detectives could have informed the prosecution or the judge of the truth and prevented Plaintiff's wrongful prosecution and conviction.

155.    Further, SCARCELLA, CHMIL, and BARBA could have come forward with the truth after the conviction in order to right this wrong, but they nevertheless failed to do so.

156.    SCARCELLA, CHMIL, and BARBA thereby displayed deliberate indifference to Plaintiff's rights, including but not limited to Plaintiff's right to be free from false and fabricated criminal charges.

157.    SCARCELLA, CHMIL, and BARBA thus violated Plaintiff's rights under the United States Constitution, which is actionable under 42 U.S.C. § 1983.

158.    As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff suffered the injuries and damages set forth above.

159.    SCARCELLA, CHMIL, and BARBA are therefore liable for Plaintiff's injuries.

160.     SCARCELLA, CHMIL, and BARBA'S actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

## SIXTH CAUSE OF ACTION

### 42 U.S.C. § 1985 Civil Rights Conspiracy
### (Against SCARCELLA, CHMIL, and BARBA)

161.     Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

162.     SCARCELLA, CHMIL, and BARBA agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his clearly established rights, including but not limited to the right to be free from false and fabricated criminal charges.

163.     In furtherance of the conspiracy SCARCELLA, CHMIL, and BARBA engaged in and facilitated numerous overt acts, including, without limitation, working together to disguise the true circumstances behind Plaintiff's arrest and the identification by Crosson.

164.     As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff suffered the injuries and damages set forth above.

165.     SCARCELLA, CHMIL, and BARBA are therefore liable for Plaintiff's injuries under 42 U.S.C. § 1985.

166.     SCARCELLA, CHMIL, and BARBA'S actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

## SEVENTH CAUSE OF ACTION

### 42 U.S.C. § 1986 Failure to Prevent Civil Rights Conspiracy
### (Against SCARCELLA, CHMIL, and BARBA)

167.     Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

168.    SCARCELLA, CHMIL, and BARBA knew that acts previously mentioned, which violated Plaintiff constitutional rights, were about to be committed, and they had the power to prevent or aid in preventing the commission of the same, but they neglected or refused to do so.

169.    As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff suffered the injuries and damages set forth above.

170.    SCARCELLA, CHMIL, and BARBA are therefore liable for Plaintiff's injuries under 42 U.S.C. § 1986.

171.    SCARCELLA, CHMIL, and BARBA'S actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

### EIGHTH CAUSE OF ACTION

### Denial of Due Process and Denial of Fair Trial based on *Monell* Municipal Liability under 42 U.S.C. § 1983 as to the NYPD (Against the CITY OF NEW YORK)

172.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

173.    Shortly after Plaintiff's conviction, the Mollen Commission, which included an investigation of the same years when Plaintiff was arrested, framed, and prosecuted, exposed the NYPD's practice of failing to properly train, supervise, and discipline officers for fabricating evidence, engaging in improper police investigations, and failing to turn over *Brady* material.

174.    SCARCELLA himself is a key example of the wrongdoing that the NYPD allowed to flourish in the late 80s and early 90s. The sheer magnitude of his wrongdoing, which occurred in front of multiple fellow officers, could not have gone unnoticed. And yet he never suffered any consequences. At one point, he was reassigned to a different precinct for misconduct, but he was never disciplined in any meaningful way. In fact, to this day the NYPD stands by him, he still

receives a pension, and he is still a retired officer in good standing, which essentially ratifies his misconduct. Even after 14 exposed wrongful convictions (so far) the NYPD has never condemned SCARCELLA'S misdeeds.

175.    In Plaintiff's case, SCARCELLA manufactured two identifications (BUNN'S and Hargrave's, both of which were admitted in the joint trial), just as he manufactured the identification SCARCELLA used to frame David Ranta just one year earlier. And SCARCELLA failed to disclose this misconduct and all the other times he had fabricated evidence in other criminal cases, in violation of *Brady* and/or *Giglio*.

176.    Fabricating evidence, hiding it from the prosecution, and failing to disclose the misconduct as *Brady* and/or *Giglio* material violated Plaintiff's right to due process of law and to a fair trial under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution and pursuant to *Brady/Giglio* and their progeny.

177.    The NYPD'S abject failure to discipline prosecutors was the driving force behind this violation, and thus the CITY OF NEW YORK is liable for this violation of Plaintiff's rights and the damage it caused.

## NINTH CAUSE OF ACTION

**Denial of Due Process and Denial of Fair Trial based on *Monell* Municipal Liability under 42 U.S.C. § 1983 as to KCDAO
(Against the CITY OF NEW YORK)**

178.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

179.    Prior to Plaintiff's arrest, and during the course of his prosecution, policymaking officials at the KCDAO, including but not limited to the District Attorney Charles Hynes, acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with

criminal activity; implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and/or discipline concerning the constitutional duties of assistant district attorneys to make timely disclosure of *Brady* material.

180.    Hynes tolerated numerous violations of criminal defendants' rights, and has admitted in litigation that he, and high-level management at the KCDAO, entirely failed to discipline prosecutors who were found by appeals courts to have acted improperly by withholding *Brady* material, engaging in misconduct during summation, and other violations. This fostered a convictions-at-all-costs attitude at the KCDAO, because prosecutors knew that as long as they secured convictions any way they could, the District Attorney would not only fail to discipline them, he would protect them, back them up, and vigorously oppose any attempts to uncover the wrongdoing when those convictions were challenged in court – even after SCARCELLA'S pattern of misconduct was uncovered.

181.    Crosson's claimed identification of Plaintiff was the only evidence holding the prosecution together. None of the physical evidence linked either BUNN or Hargrave to the murder. And Crosson's identification was already at risk given that the defense knew that Crosson had only seen the real murderers for a very short period time, while he had guns pointed at him taking his focus away from their faces, and certainly disabling him to effectively see the perpetrator on the driver's side of the car (the perpetrator claimed to be Plaintiff).

182.    But Crosson, around the time he made the identification, was either intoxicated (likely from painkillers) and was distraught, which was caught on an audio tape withheld by the KCDAO.   Also on the withheld tape, Crosson described the crime to be much quicker than how he described it at trial, and he described himself to be more panicked when the crime occurred as opposed being calm as he portrayed himself to be at trial.   In the hands of the defense, this audio

tape would have exposed Crosson's identification of Plaintiff as being fundamentally unreliable and of Crosson's account at trial to be far less persuasive to a jury.

183.    Indeed, had the prosecution turned over the audio tape to the defense before trial it likely would have prepared Crosson differently and had him testify in more truthful manner that would have led to an acquittal (if not an abandonment of the prosecution).

184.    Failing to turn over this audio tape violated Plaintiff's right to due process of law and to a fair trial under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution and pursuant to *Brady/Giglio* and their progeny.

185.    The KCDAO'S abject failure to properly train, supervise, and/or discipline prosecutors was the driving force behind this violation, and thus the CITY OF NEW YORK is liable for this violation of Plaintiff's rights and the damage it caused.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

a.  Compensatory damages in an amount to be determined;

b.  Punitive damages in an amount to be determined;

c.  Pre-judgment interest as allowed by law;

d.  An order awarding Plaintiff reasonable attorneys' fees, together with the costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

e.  Such other further relief as the Court may deem just and proper.

Dated: New York, New York
      August 13, 2019             GLENN A. GARBER, P.C.

                                By: _____/s/_____
                                    Glenn A. Garber

The Woolworth Building
233 Broadway, Suite 2370
New York, New York 10279
(212) 965-9370

RICKNER PLLC

By: _____/s/_____
         Rob Rickner

The Woolworth Building
233 Broadway, Suite 2220
New York, New York 10279
(212) 300-6506

*Attorneys for John Bunn*

# Exhibit A

*Brady and Related Violations by the NYPD*

1.     *People v. Cortez,* 149 Misc.2d 886 (Sup. Ct. Kings Co. 1990): Police's intentional destruction of tape they were ordered by the court to preserve, and shared responsibility by D.A.'s office in violation caused dismissal of indictment.

2.     *People v. Moss,* 176 A.D.2d 826 (2d Dept. 1991): Conviction reversed for police officer's loss and/or destruction of evidence about description of the defendant that undermined defense's ability to challenge identification.

3.     *People v. Clausell,* 182 A.D.2d 132 (2d Dept. 1992): Police failed to disclose police report with description of suspect that was inconsistent with officer's testimony. New trial ordered for *Brady* violation.

4.     *People v. Nikollaj,* 155 Misc.2d 642 (Sup. Ct. Bronx County 1992): New trial ordered where police failed to turn over inconsistent statements of complainant officers. Court also criticized police for conducting improper identification procedures.

5.     *People v. Dunn,* 185 A.D.2d 54 (1st Dept. 1993): Conviction reversed in part where, among other things, police detective destroyed interview notes.

6.     *People v. Johnson,* 81 N.Y.2d 828 (1993): Conviction reversed where police utilized improper identification procedures to implicate defendant.

7.     *People v. White,* 200 A.D.2d 351 (1st Dept. 1994): Conviction reversed where police report containing *Brady* and *Rosario* material was not disclosed

8.     *People v. Morrow,* 204 A.D.2d 356 (2d Dept. 1994): Conviction reversed where a significant portion of police report was not disclosed.

9.     *People v. Rojas,* 213 A.D.2d 56 (1st Dept. 1994): Conviction reversed where identification procedure was tainted by improper and prejudicial conduct.

10.    *People v. Anderson,* 222 A.D.2d 442 (2d Dept. 1995): Conviction reversed officer's notes where lost or destroyed by officer.

11.    *People v. Brogdon,* 213 A.D.2d 418 (2d Dept. 1995): Conviction reversed where notes made by NYPD sergeant were withheld from defendant that may have compromised challenge to identification.

12. *People v. Joseph,* 86 N.Y.2d 565 (1995): Adverse inference instruction required where police deliberately destroyed interview notes.

13. *People v. White,* 232 A.D.2d 436 (2d Dept. 1996): Conviction reversed where loss of police officer's memo book prejudiced defendant's ability to challenge identification.

14. *People v. Pondexter* (contributing factor for wrongful conviction was police pressuring witness to identify defendant)(convicted 1993/exonerated 1997)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4494

15. *People v. Burt* (exoneration delayed because police withheld post-conviction recantation from eyewitness)(convicted 1994/exonerated 2002)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3075

16. *People v. Taylor* (contributing factor for wrongful conviction was the withholding of evidence by police and prosecutors that defendant did not meet the description of the perpetrator)(convicted 1989/exonerated 2004)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3935

17. *People v. Greene* (contributing factor for wrongful conviction was improper identification procedures, manipulating witness to falsely identify defendant, and withholding of exculpatory evidence)(convicted 1985/exonerated 2006)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3951

18. *Garcia v. Portunado,* 2007 WL 542224 (SDNY 2007)(contributing factor of wrongful conviction was police pressuring witness to falsely implicate defendant)(convicted 1993/exonerated 2007)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3835

19. *People v. Collins* (contributing factors for wrongful conviction was systemic pattern of police and prosecutorial misconduct, including witness intimidation)(convicted 1995/exonerated 2010)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3115

20. *People v. Devon Ayers* (in two unrelated homicide convictions against defendant contributing causes of wrongful convictions were police manipulation of unreliable witnesses and lying to prosecutors about manufactured evidence)(convicted 1997/exonerated 2012)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4075
       (*related cases, People v. Vasquez, People v. Cosme, People v. Perez, People v. Glisson and People v. Watkins*)

21. *People v. O'Neal* (contributing factor for wrongful conviction was police withholding evidence that victim said defendant was not her attacker)(convicted 1985/exonerated 2013)https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4246

22. *People v. Ranta* (contributing factor for wrongful conviction was police influencing witness to make an identification)(convicted 1991/exonerated 2013)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4127

23. *People v. Deacon* (contributing factor for wrongful conviction was police pressuring witness to implicate defendant)(convicted 1989/exonerated 2013)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4307

24. *People v. Fleming* (contributing factor for wrongful conviction was police pressuring witness to implicate defendant)(convicted 1990/exonerated 2014)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4412

25. *People v. Austin* (contributing factors for wrongful conviction were police influencing witness to make an identification and the use of an unreliable informant)(convicted 1988/exonerated 2014)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4427
(related cases *People v. Hill* and *People v. Jennette*)

26. *People v. McCallum* (contributing factor for wrongful conviction was police coercing confession from defendant and co-defendant)(convicted 1986/exonerated 2014)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4524
(related case *People v. Stuckey*)

27. *People v. Wilson* (contributing factor for wrongful conviction was police coercing confession from defendant and co-defendant)(convicted 1994/exonerated 2014)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4372
(related case *People v. Yarbough*)

28. *People v. Connor* (contributing factor for wrongful conviction were police pressuring witness to falsely implicate defendant and co-defendant)(convicted 1993/exonerated 2015)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4724
(related case *People v. Wagstaffe*)

29. *People v. Hamilton* (contributing factor for wrongful conviction was police influencing witness to not support defendant's alibi)(convicted 1992/exonerated 2015)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4601

30. *People v. Shakur* (contributing factor for wrongful conviction was police fabrication of confession)(convicted 1989/exonerated 2015)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4701

31. *People v. Gathers* (contributing factor for wrongful conviction was police using false evidence ploy to manipulate defendant to falsely confess)(convicted 1998/exonerated 2016)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4839

32.   *People v. Hincapie,* (contributing factor for wrongful conviction was improper police investigation techniques that involved coerced confession)(convicted 1991/exonerated 2017)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5094

33.   *People v. Washington* (contributing factor for wrongful conviction was police falsification about the quality of the identifications)(convicted 1997/exonerated 2017)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5170

34.   *People v. Bunn* (contributing factor for wrongful conviction was arresting placing him in line-up despite lack of any evidence connecting him to crime and although his description varied widely from the perpetrator, among other things)(convicted 1992/exonerated 2018)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5327
(related case *People v. Hargrave*)

35.   *People v. Moses* (contributing factor for wrongful conviction was confession coerced by police)(convicted 1997/exonerated 2018)

36.   *People v. Williams* (contributing factor for wrongful conviction was police coercing witness to falsely identify defendant)(convicted 1994/exonerated 2018)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5358

37.   *People v. Buari* (contributing factors for wrongful conviction was improper police investigation techniques)(convicted 1995/exonerated 2018)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5297

38.   *People v. Burton* (contributing factors for wrongful conviction was improper police investigation techniques and failure to investigate viable alternate suspect)(convicted 1991/exonerated 2019)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5485

# **Exhibit B**

Brady and Related Misconduct by
NYPD in Civil Cases

1.  *Hart v. City of New York,* 186 A.D.2d 398 (1st Dept. 1992): Damage award upheld against police officers who gave false grand jury and trial testimony.

2.  *Tong v. City of New York, et al.,* 95-cv-7965 [S.D.N.Y., settled 10/4/95, $35,000]: Plaintiff arrested for traffic violation, which was later dismissed. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train and supervise police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

3.  *Dabbah v. City of New York, et al.,* 95-cv-2952 [S.D.N.Y., settled 3/12/96, $35,000]: Plaintiff arrested without probable cause on disorderly conduct charges; charges dismissed on People's motion 8 months after arrest.

4.  *Boland v. City of New York, et al.,* 93-cv-5058 [E.D.N.Y., settled 8/6/96, $30,000]: Plaintiff arrested without probable cause; held in custody for two nights.

5.  *Kadlub v. City of New York, et al.,* 95-cv-1080 [E.D.N.Y., settled 12111/96, $34,000]: Plaintiff arrested without probable cause on drug possession and sale charges. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

6.  *Castro v. City of New York, et al.,* 94-cv-5114 [S.D.N.Y., settled 3/18/97, $72,500]: Plaintiff arrested on weapons possession without probable cause; charges dropped after plaintiff was held in custody for several hours. Complaint alleged that NYPD officer responded to plaintiff's complaints about wrongful arrest by saying that he would not release her, but if the arrest were in error she could "always sue the City, [because] they got a lot of money."

7.  *McCaskill v. City of New York, et al.,* 96-cv-3687 [E.D.N.Y., settled 7/10/97, $100,000]: Plaintiff arrested for disorderly conduct without probable cause; charges pending for approximately 6 months before dismissal by the court.

8.  *Gurley v. City of New York, et al.,* 95-cv-2422 [E.D.N.Y., settled 8/21/97, $1,7500,000]: Conviction obtained in 1972 was vacated over 20 years later based on prosecutor's withholding of exculpatory evidence, including an NYPD ballistics report. Complaint alleged that NYPD had longstanding policy of deliberate indifference to the constitutional requirement that exculpatory evidence be preserved and disclosed to defendants.

9.  *Gaylock v. City of New York, et al.,* 96-cv-6183 [E.D.N.Y., settled 3/6/98, $90,000]: Plaintiffs arrested without probable cause on weapons charges, which were pending for

10 months before dismissal by court.  Complaint alleged *Monell* theory of liability based on the City's failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff s constitutional rights.

10.   *Gordon v. City o/ New York, et al.,* 97-cv-8035 [S.D.N.Y., settled 11/12/98, $40,000]: Plaintiff arrested without probable cause based on false allegations in felony complaint made by NYPD officers; charges dismissed by prosecutor 3 months after arrest.

11.   *Perez v. City o/ New York, et al.,* 98-cv-2331 [S.D.NY., settled 1/16/99, $15,000]: Plaintiff arrested without probable cause; charges dismissed by court approximately 6 months after arrest.

12.   *Ziehenni v. City of New York, et al.,* 98-cv-3763 [S.D.N.Y., settled 3/5/99, $55,000]: Plaintiff arrested without probable cause; charges pending for 2 *Yi* months before they were dismissed by the court.  Complaint alleged arrest was made in retaliation for plaintiff s prior CCRB complaint.

13.   *Deluise v. City o/ New York, et al.,* 98-cv-2551 [S.D.N.Y., settled 3/18/99, $28,500]: Plaintiff arrested without probable cause.

14.   *Napoli v. City of New York, et al.,* 97-cv-1255 (E.D.N.Y., settled 4/9/99, $60,000]: Plaintiff arrested on weapons possession and assault charges based on false testimony by NYPD officers in grand jury.  Plaintiff acquitted approximately one year after arrest. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train and supervise police officers, and negligent hiring of officers, which caused violations of plaintiff s constitutional rights.

15.   *Jefferson v. City o/ New York, et al.,* 98-cv-1097 [E.D.N.Y., settled 4/14/99, $175,000]: Plaintiff corrections officer arrested on drug charges without probable cause; charges pending for 5 months before grand jury returned no true bill.  Complaint alleged that NYPD officers failed to inform prosecutors of their knowledge of plaintiff s innocence during the prosecution.

16.   *Denizard v. City of New York, et al.,* 98-cv-423 [E.D.N.Y., settled 6/4/99, $64,000]: Plaintiff arrested without probable cause for disorderly conduct, resisting arrest.  Charges dismissed on People's motion eight months after arrest.

17.   *Sweazie v. City of New York, et al.,* 99-cv-419 [E.D.N.Y., settled 10/20/99, $20,000]: Plaintiff arrested on weapons possession charges; prosecution continued based on NYPD officers' false statements in felony complaint.  Charges dismissed when grand jury voted no true bill.  Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff s constitutional rights; also alleged NYPD's institutional failure to follow up on civilian complaints made to IAB and CCRB.

18.     *Daniels* v. *City of New York, et al.,* OO-cv-1981 [S.D.N.Y., settled 3/15/00, $28,500]: Plaintiff arrested without probable cause on weapons charges; charges dismissed by the court 8 months after arrest.

19.     *Almonte* v. *City of New York, et al.,* 99-cv-519 [E.D.N.Y., settled 7/12/00, $30,000]: Plaintiff arrested on drug sale charges without probable cause; indictment dismissed by the court 1 year, 9 months after arrest.  Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional rights, failure to train police officers, and negligent hiring of officers, which caused plaintiff's malicious prosecution and unlawful arrest.

20.     *Fields* v. *City of New York, et al.,* 99-cv-8130 [E.D.N.Y., settled 7/28/00, $15,000]: Plaintiff arrested without probable cause; prosecution continued for four months before dismissal by court.  Complaint alleged *Monell* theory of liability based on the City's failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

21.     *Younger* v. *City of New York, et al.,* OO-cv-836 [S.D.N.Y., settled *911100,* $25,000]: Plaintiff arrested without probable cause; complaint alleged that arrest was made in retaliation for plaintiff's complaint to IAB.

22.     *Lovell* v. *City of New York, et al.,* OO-cv-0002 [S.D.N.Y., settled 10/20/00, $40,000]: Plaintiff arrested without probable cause for turnstile jumping based on false statements made by NYPD officer in criminal complaint.  Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights; also alleged NYPD's institutional failure to follow up on civilian complaints made to IAB and CCRB.

23.     *Cotto* v. *City of New York, et al.,* 00-cv-1341 [E.D.N.Y., settled 12/01/00, $30,000]: Plaintiff arrested without probable cause; charges pending for one month before dismissal by the court.

24.     *Coleman* v. *City of New York, et al.,* 00-cv-2019 [E.D.N.Y., settled 1/2/01, $60,000]: Two plaintiffs arrested without probable cause.

25.     *Crespo v. City of New York, et al.,* 93-cv-8847 [S.D.N.Y., settled 8/29/06, $25,000]: Plaintiff arrested without probable cause on weapons possession charges.  Complaint alleged *Monell* claim based on the NYPD's "foster[ing of] a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals."

26.     *Gallo* v. *New York City Police Department,* 93 CV 2105 (E.D.N.Y.)($133,340);

27.     *Gallion v. Detective Pereira, et al.,* 93 CV 5180 (S.D.N.Y.) ($25,000);

28. *Lopez and Ravitz* v. *City of New York,* 93 CV 6516 (S.D.N.Y.) ($80,000);

29. *Nakajima and Fancis* v. *Alamo Rent-a-Car, Inc., et al.,* 94 CV 0857 (E.D.N.Y.)($51,000);

30. *Nieves* v. *City of New York,* 94 CV 1491 (E.D.N.Y.)($50,000);

31. *Shabazz, et al.* v. *Detective Gerald Shisko, et al.,* 94 CV 0029 (E.D.N.Y.)($30,000);

32. *Agnew, et al.* v. *Bratton, et al.,* 94 CV 6508 (S.D.N.Y.) ($90,000);

33. *Taousse* v. *City of New York,* 95 CV 7965 (S.D.N.Y.)($16,000);

34. *Mahase, et al.* v. *City of New York,* 96 CV 6105 (E.D.N.Y.) ($75,000);

35. *Martinez* v. *City of New York,* 96 CV 0289 (E.D.N.Y.) ($50,000);

36. *Tomback* v. *Dear, et al.,* 96 CV 3972 (E.D.N.Y.)($20,000);

37. *Frantino* v. *City of New York,* 96 CV 3725 (S.D.N.Y.) ($50,000);

38. *Bradley* v. *P.O. Lisa Reale, et al.,* 97 CV 4076 (E.D.N.Y.)($20,000);

39. *Sierzputowski and Sulima* v. *City of New York,* 97 CV 2687 (E.D.N.Y.)($55,000);

40. *Silver* v. *City of New York, et al.,* 97 CV 5384 (E.D.N.Y.) ($40,000);

41. *Gager* v. *City of New York,* 97 CV 4718 (S.D.N.Y)($105,000);

42. *Bernard* v. *City of New York, et al.,* 98 CV 6068 (E.D.N.Y.)($36,000);

43. *Dennis* v. *Leak, et al.,* 98 CV 5355 (E.D.N.Y.)($15,000);

44. *Golston* v. *City of New York,* 98 CV 4206 (E.D.N.Y.)($25,000);

45. *Jefferson* v. *City of New York, et al.,* 98 CV 1097 (E.D.N.Y.) ($175,000);

46. *Deluise* v. *City of New York, et al.,* 98 CV 4535 (S.D.N.Y.) ($28,000);

47. *Lindo* v. *City of New York,* 98 CV 9066 (S.D.N.Y.)($80,000);

48. *Haygood, et al. V City of New York, et al.,* 99 CV 0026 (S.D.N.Y.)($32,500);

49. *Udofia, et al.* v. *City of New York,* 00 CV 4872 (E.D.N.Y.) ($30,000);

50. *Davis* v. *City of New York,* 00 CV 387 (S.D.N.Y.)($175,000);

## **Exhibit C**

Brady and Related Misconduct in Criminal Cases
Kings County District Attorney's Office

1.   *People v. Murphy,* 109 A.D.2d 895 (2d Dept. 1985)(prosecutor failed to timely disclose *Brady* material);

2.   *People v. Perez,* 65 N.Y.2d 154 (1985)(prosecutor committed *Rosario* violation by failing to disclose documentation indicating key witness accepted bribe);

3.   *People v. Gairy,* 116 A.D.2d 733 (2d Dept.  1986)(prosecutor failed to timely disclose *Brady* material);

4.   *People v. Ranghelle,* 69 N.Y.2d 56 (1988)(DA failed to obtain and disclose *Rosario* material; conviction reversed);

5.   *People v. Lugo,* 153 A.D.2d 761 (2d Dept. 1989)(prosecutor's suppression of *Rosario* material required reversal of conviction);

6.   *People v. Cortez,* 149 Misc.2d 886 (Sup. Ct., Kings Co. 1990)(police violated *Brady* by violating court order and intentionally destroying tape containing impeachment material; DA "shared responsibility"; indictment dismissed);

7.   *People v. Nedrick,* 166 A.D.2d 725 (2d Dept. 1990) (failure to disclose tape-recorded impeachment material);

8.   *People v. Anderson,* 160 A.D.2d 806 (2d Dept. 1990)(prosecutor failed to timely disclose impeachment material);

9.   People v. Brazzeal, 172 A.D.2d 757 (2d Dept. 1991) (prosecutor gave an improper and prejudicial summation);

10.   *People v. Faison,* 176 A.D.2d 752 (2d Dept. 1991)(prosecutor belatedly disclosed witness' prior statement);

11.   *People v. Crespo,* 188 A.D.2d 483 (2d Dept. 1992)(mistrial granted due to prosecutor's *Brady* violation);

12.   *People v. Brown,* 187 A.D.2d 437 (2d Dept. 1992)(trial court sanctioned prosecutor for *Brady* violation);

13.   *People v. Young,* 155 Misc.2d 878 (Sup. Ct. Kings Co. 1992), *on remand from,* 79 N.Y.2d 365 (1992)(failure to disclose impeachment material required new trial; hearing court condemned prosecution for tailoring testimony);

14.   *Walker v. City of New York,* 974 F.2d 293 (2d Cir. 1992)(court upheld *Monell* claim

against City of New York for unlawful policies of Brooklyn D.A.'s Office that allegedly resulted in withholding of *Brady* material causing plaintiff s wrongful conviction and 18-year imprisonment (City settled for $3.5 million]);

15.   *People v. Donald Giddings,* 2l21192 NYLJ 25 (col. l)(Sup. Ct., Kings Co. February 21, 1992)(prosecutor's failure to disclose witness's prior inconsistent statements required conviction to be vacated);

16.   *People v. Cecora,* 186 A.D.2d 215 (2d Dept. 1992)(failure to disclose ADA interview notes with arresting officer containing potential impeachment);

17.   *People v. Hughes,* 181 A.D.2d 132 (2d Dept. 1992)(hearing required regarding failure to disclose exculpatory police report);

18.   *People v. Inswood,* 180 A.D.2d 649 (2d Dept. 1992)(DA's failure to turn over *Brady* material was error);

19.   *People v. Jackson,* 198 A.D.2d 301 (2d Dept. 1993), affirming 154 Misc.2d 718 (Sup. Ct., Kings County. 1992)(prosecutors failed to timely disclose exculpatory statements; conviction reversed);

20.   *People v. Stevens,* 199 A.D.2d 441 (2d Dept. *1993)( Rosario* material "improperly" withheld as well as *Brady* material; prejudice not sufficient to require reversal);

21.   *People v. Khadaidi,* 201 A.D.2d 585 (2d Dept. 1994)(conviction reversed for DA's failure to disclose prosecutor's interview notes with complainant containing a prior inconsistent statement);

22.   *People v. Alvarado,* 201 A.D.2d 486 (2d Dept. 1994)(police reports containing impeachment material not disclosed, conviction reversed);

23.   *People v. Barnes,* 200 A.D.2d 751 (2d Dept. 1994)(prosecutor did not record and did not disclose eyewitness's recantation; conviction not reversed because eyewitness ultimately recanted on the witness stand and was adequately cross-examined);

24.   *People v. Bramble,* 207 A.D.2d 407 (2d Dept. 1994)(sanctions upheld for prosecution's failure to preserve police audiotapes notwithstanding defense discovery request);

25.   *People v. Roberts,* 203 A.D.2d 600 (2d Dept. 1994)(DA delayed one year in disclosing exculpatory witness statement, by which time witness was unavailable; conviction reversed);

26.   *People v. Neptune,* 161 Misc.2d 781 (Sup. Ct. Kings County 1994)(Gerges, J.)(court ruled D.A.'s Office acted unethically by improperly using invalid subpoena to cause a witness to appear for an interview at the D.A.'s office);

27.    *People v. Scott,* 216 A.D.2d 592 (2d Dept. 1995)(DA suppressed reports, including polygraph results indicating key witness was withholding information);

28.    *People v. Ramos,* 166 Misc.2d 515 (Sup. Ct. Kings Co. 1995)(due to DA's policy of not taking notes of witness interviews, trial assistant not aware that previous assigned prosecutors interviewed complainant and possibly obtained information the court had required the People to disclose to the defense; conviction vacated on due process grounds);

29.    *People v. Rahman,* 231 A.D.2d 745 (2d Dept. 1996)(matter remitted for hearing concerning prosecution's apparent improper withholding of witness's cooperation agreement);

30.    *People v. Perkins,* 227 A.D.2d 572 (2d Dept. 1996)(prosecutor failed to disclose cooperation agreement as required with witness);

31.    *People v. Scott,* 88 N.Y.2d 888 (1996)(DA failed to disclose statement regarding polygraph result);

32.    *People v. Callendar,* 227 A.D.2d 499 (2d Dept. 1996) (conviction reversed due to ADA's failure to turn over notes of detective's prior statement]);

33.    *People v. Bruce,* 224 A.D.2d 438 (2d Dept. 1996)(conviction reversed for prosecutor's failure to produce police reports containing impeachment material);

34.    *People v. Dominic Dupont,* Kings County Indictment Number 6287/97 (Feldman, J.)(court found ADA made misrepresentation by claiming Office did not possess physical evidence specifically requested by the defense);

35.    *People v. LaSalle,* 243 A.D.2d 490 (2d Dept. 1997)(conviction reversed due to prosecutor's "blatant misrepresentation of the facts" during summation);

36.    *People v. Gourgue,* 239 A.D.2d 357 (2d Dept. 1997)(prosecutor put notes of complainant's statements in the form of questions to "circumvent" disclosure obligation; conviction reversed);

37.    *People v. Hill,* 244 A.D.2d 572 (2d Dept. 1997)(prosecutor sanctioned for failing to disclose 911 tape);

38.    *People v. Gramby,* 251 A.D.3d 346 (2d Dept. 1998)(prosecutor suppressed 911 tape during pre-trial hearing and failed to disclose it before trial);

39.    *People v. Green,* 10/19/99 N.Y.L.J. p.30, col. 1 (Sup. Ct., Kings Co., October 19, 1999)(Starkey, J.)(People failed to disclose *Brady* material);

40.    *People v. Bond,* 95 N.Y.2d 840 (2000)(myriad *Brady* violations established at CPL

440.10 hearing, including failure to disclose material witness proceeding concerning principal witness; conviction reversed due to failure of D.A. to disclose prior unrecorded statements to police by People's main witness that she did not see the shooting about which she testified as an "eyewitness");

41. *People v. Davis,* 709 N.Y.S.2d 345 (Sup.Ct. Kings Co. 2000)(D.A.'s Office violated court's order to disclose exculpatory evidence to defense before indictment; indictment dismissed);

42. *People v. Campbell,* 269 A.D.2d 460 (2d Dep't 2000) (prosecutor's suppression of *Rosario* material, a tape-recorded statement by the complainant, required reversal of conviction);

43. *People v. Calabria,* 94 N.Y.2d 519 (2000)(prosecutor repeatedly defied court's ruling and made false or misleading argument to jury);

44. *People v. Campos,* 281 A.D.2d 638 (2d Dept. 2001)(prosecutor failed to timely disclose *Brady* material; prejudice not sufficient to require reversal);

45. *Leka v. Portuondo,* 257 F.3d 89 (2d Cir. 2001)(conviction overturned on habeas review due to ADA's suppression of *Brady* material; ADA additionally misled defense counsel regarding a crucial witness);

46. *People v. Maddery,* 282 A.D.2d 761 (2d Dept. 2001) (prosecutor's failure to disclose 911 tape before trial as required by law required reversal of conviction);

47. *Boyette v. LeFevre,* 246 F.3d 78 (2d Cir. 2001)(conviction vacated on habeas review because prosecutors had suppressed numerous items of *Brady* material could have persuaded the jury to acquit the defendant, who had a strong alibi defense);

48. *People v. Cannon,* 191 Misc.2d 136 (Sup. Ct. Kings County 2002)(police failed to preserve surveillance photographs, conduct for which the D.A. is "accountable");

49. *People v. King,* 298 A.D.2d 530 (2d Dept. 2002)(prosecutor's failure to disclose 911 tape before trial as required by law required conviction to be reversed);

50. *People v. Jenkins,* 98 N.Y.2d 280, 287-88 (2002)(Kaye, C.J., dissenting)(prosecutor's late disclosure of ballistics report "blind sided" the defense and was inexcusable);

51. *People v. Vielman,* 31 A.D.3d 674 (2d Dept. 2006)(reversing conviction because prosecutor's summation rested on a "false premise" and was a "blatant attempt to mislead the jury");

52. *People v. Jones,* 31 A.D.3d 666 (2d Dept. 2006)(prosecution fails to correct the false testimony of a key witness);

53.     *People v. Thompson,* 54 A.D.3d 975 (2d Dept. 2008)(prosecutor suppressed *"Brady* material"* indicating someone other than the defendant committed the crime);

54.     *Waston v. Greene,* 2009 WL 5172874 (E.D.N.Y. 2009)(Ross, J.)(DA disclosed *Brady* material "too late" for the defense to make use of it even though they were aware of material "more than a year in advance of trial");

55.     *People v. Malik,* 25 Misc.3d 1214(A) (Sup. Ct. Kings County 2009)(Goldberg, J.)(prosecution's suppression of police report and other documents required vacatur of conviction);

56.     *People v. Fuentes,* 12 N.Y.3d 259 (2010)(prosecutor improperly withheld one-page of notes from medical records of complainant containing potentially favorable evidence for the defense; two judges find the suppression was "deliberate").